IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIAM ERNEST SCOTT, TDCJ #576705, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-09-3991 |
| BILL PIERCE, *et al.*, | § § § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate William Ernest Scott (TDCJ #576705) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights. At the Court's request, Scott has also supplied a more definite statement of his claims. (Docket No. 6). Pending before the Court is a motion for summary judgment filed by Huntsville Unit Chaplain Larry Hart, who argues that Scott fails to demonstrate a valid claim. (Docket No. 19). Scott has filed a response. (Docket No. 22). After reviewing all of the pleadings, the exhibits, and the applicable law, the Court denies summary judgment for reasons set forth below.

**I.   BACKGROUND**

Scott is presently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (collectively, "TDCJ"), at the Huntsville Unit. His complaint raises the issue of inadequate religious programming at the Huntsville Unit facility. In particular, Scott claims that he has been denied the opportunity to practice his

religious beliefs because of a prison policy that requires the presence of an approved volunteer from the "freeworld" to supervise all group worship activities.

Scott, who describes himself as "a Jehovah's Witness," explains that he and other Jehovah's Witnesses at the Huntsville Unit wish to meet as a group every Saturday to practice their beliefs as required by the Bible.[1] Scott complains, however, that Jehovah's Witnesses at the Huntsville Unit facility were denied "religious meetings" of this sort on numerous Saturdays during 2008 and 2009, because a freeworld volunteer was not available.[2] As Scott concedes, the TDCJ policy on religious programming requires the availability of security personnel as well as the presence of a TDCJ Chaplain or an approved volunteer to lead all religious services held in the state prison facilities. Scott notes, however, that inmates of the Muslim faith are allowed to meet for two hours on Fridays and two hours on Saturdays with or without a volunteer. Scott asked Unit Chaplain Larry Hart to extend similar privileges to Jehovah's Witnesses at the Huntsville

---

[1] In his more definite statement, Scott explains that Jehovah's Witnesses take the commandments of the Bible seriously, and that the Bible dictates meeting together with others for worship. (Docket No. 6, ¶ 6(f)) (citing Hebrews 10:24– 25). Scott alleges further that, according to the Bible, Jehovah's Witnesses must meet "separate[ly] from other religions." (*Id.* at ¶ 8) (citing 2 Timothy 3:5; 2 Corinthians 6:14–17; and the Book of Revelation 18:4).

[2] The defendant does not dispute that there were no group meetings for Jehovah's Witnesses at the Huntsville Unit on the following Saturdays: October 18, 2008; October 25, 2008; November 1, 2008; November 8, 2008; November 15, 2008; January 31, 2009; March 7, 2009; March 21, 2009; April 4, 2009; April 11, 2009; May 5, 2009; June 20, 2009; June 27, 2009; July 18, 2009; August 8, 2009; August 22, 2009; and September 19, 2009. Likewise, there were no Saturday group meetings at all for Jehovah's Witnesses at the Huntsville Unit during the months of October 2009, December 2009, or January 2010, for lack of an approved volunteer.

Unit, but Scott's request was denied pursuant to the TDCJ policy that requires the presence of a volunteer.

Scott complains that, by refusing to allow Jehovah's Witnesses to convene for weekly group worship activities without an available volunteer, enforcement of the TDCJ volunteer policy has interfered with the practice or expression of his religious beliefs in violation of the First Amendment. Scott also appears to complain that the volunteer policy has imposed a substantial burden on the practice of his religious beliefs in violation of the Religious Land Use and Institutionalized Persons Act (the "RLUIPA"), 42 U.S.C. § 2000cc-1. Scott does not seek monetary damages. Instead, he requests injunctive relief in the form of a court order directing prison officials to allow Jehovah's Witnesses to hold "regularly scheduled meeting[s] with or without a volunteer," similar to the privilege extended to Muslim inmates in TDCJ.

Chaplain Hart has filed a motion for summary judgment, arguing that Scott is not entitled to relief and that his claims fail as a matter of law.[3] Scott disagrees. The parties' contentions are discussed further below under the governing standard of review.

---

3   On July 26, 2010, the Court granted a motion to dismiss TDCJ Director of Chaplaincy Bill Pierce and Warden Charles O'Rielly for lack of sufficient personal involvement in the alleged violation that forms the basis of Scott's complaint. (Docket No. 17). Scott now complains that these defendants were dismissed prematurely. (Docket No. 22). Because Scott filed suit against the defendants in their official capacity as employees of TDCJ and the State of Texas, it appears unnecessary to reinstate Director Pierce or Warden O'Rielly as parties.

## II.  STANDARD OF REVIEW

The defendant's motion is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 248 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.*

If the movant demonstrates the absence of a genuine issue of material fact, then the burden shifts to the non-movant to provide specific facts showing the existence of a genuine issue for trial.  *See Matsushita*, 475 U.S. at 587.  In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted).  The plaintiff proceeds *pro se* in this case.  Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys.  *See Haines v. Kerner*, 404 U.S. 519 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999).  Thus, pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them.  *See Haines*, 404 U.S. at 521; *see also United States v. Pena*,

122 F.3d 3, 4 (5th Cir. 1997) (citing *Nerren v. Livingston Police Dept.*, 84 F.3d 469, 473 & n.16 (5th Cir. 1996)).

## III. DISCUSSION

### A. The TDCJ Volunteer Policy

Scott contends that enforcement of the TDCJ volunteer policy at the Huntsville Unit has violated his right to exercise his religious beliefs in violation of the First Amendment and the RLUIPA, 42 U.S.C. § 2000cc-1. The policy, identified as Administrative Directive 07.30 ("AD 07.30"), purports to govern religious programming and "chaplaincy services" in TDCJ. (Docket No. 22, Exhibit). According to Chaplain Hart, who has served as Unit Chaplain at the Huntsville Unit facility for the past eleven years, the policy set forth in AD 07.30 requires all faith groups to meet under the supervision of a TDCJ Chaplain, a TDCJ-approved religious volunteer, and security. (Docket No. 19, Exhibit A, *Hart Affidavit*). An "approved volunteer," for purposes of this policy, is "a person who provides a service or who participates in volunteer activities on a regular basis, has been approved through the application process, and has completed the volunteer training and orientation." The responsibility for training of religious volunteers at a particular facility belongs to the Unit Chaplain.[4]

---

[4] The utilization of "religious program volunteers" must also comply with a separate policy found in Administrative Directive 07.35 ("AD 07.35"), which governs the "Administration of Volunteer Services" in TDCJ as a whole.

Scott's primary complaint is that Jehovah's Witnesses are treated differently under the policy than inmates of the Muslim faith, who are allowed to meet with or without the presence of an approved volunteer. Chaplain Hart acknowledges that Muslim inmates within the TDCJ population are excused from compliance with the volunteer policy because of a federal court order that was entered on July 20, 1977. Specifically, in *Brown v. Beto*, H-69-74 (S.D. Tex.), a district court in the Southern District of Texas, Houston Division, entered a consent decree that continues to afford Muslim inmates with the opportunity to meet as a group regardless of the availability of a Chaplain or volunteer.[5]

While he acknowledges that the policy is applied differently for the Muslim faith group, Chaplain Hart insists that there are numerous opportunities for inmates to practice their religious beliefs when an approved volunteer is not available. Chaplain Hart reports that the Huntsville Unit provides religious programming throughout the week for

---

[5] Court records reflect that the civil action was filed by Bobby R. Brown against former Director of the Texas Department of Corrections, Dr. George J. Beto, and other officials, on January 24, 1969. *See Brown v. Beto*, Civil Action No. H-69-74 (S.D. Tex.) (Docket No. 1). Records on file with the Clerk's Office reflect that this case, which concerned the right to worship by Islamic or Muslim prisoners within TDC, was eventually consolidated with several others and certified as a class action (Docket No. 35), including "all past, present and future inmates at the Texas Department of Corrections who profess to adhere to the principles of the Religion of Islam (Islamic, Muslim or Moslem)." The complaint in *Brown v. Beto*, Civil Action No. H-69-74, was severed from the class on July 18, 1977, after the parties reached a settlement. Pursuant to the terms of a settlement agreement, the Honorable Robert J. O'Conor entered a consent decree on July 20, 1977. (Docket No. 53). That consent decree, which was intended to permit Islamic religious practices "under substantially the same conditions as are afforded to and enjoyed by adherents to Catholic, Jewish and Protestant faiths incarcerated within [TDC]," continues in effect.

"Protestant, Catholic, Buddhist, Latter Day Saints, Jehovah's Witnesses, Muslim, Church of Christ, and Christian Science groups." (Docket No. 19, Exhibit A, *Hart Affidavit*, at 1). These programs include Spanish-language services for Catholic and Protestant inmates. Chaplain Hart reports that all of the above-referenced religious services are open to all inmates. An inmate does not have to be a designated member of a particular faith group to attend a particular service. In addition, pursuant to TDCJ policy, an inmate may request to meet with an outside minister or spiritual adviser for up to two hours twice a month. Chaplain Hart reports further that many types of religious materials from a variety of sources are available to inmates through the Chaplaincy Library or through the mail.

Chaplain Hart advises that there are currently twenty-three (23) Jehovah's Witnesses among the inmate population at the Huntsville Unit.[6] If a volunteer is present, this group is allowed two hours of worship every week from 8:00 a.m. to 10:00 a.m. on Saturdays. This has not always been the case. Chaplain Hart reports that, when he was first assigned to the Huntsville Unit eleven years ago, Jehovah's Witnesses only met on one Saturday out of the month. Chaplain Hart concedes that Jehovah's Witnesses met sporadically in 2009. Chaplain Hart explains that the lapse in regularly scheduled services occurred because the only approved volunteer (Mr. Thelbert Blume) was experiencing unspecified health problems. There was no alternate volunteer available

---

[6] Chaplain Hart does not indicate how many inmates are currently incarcerated at the Huntsville Unit; nor does he estimate what percentage of that population are Jehovah's Witnesses.

during that time. As a result, Jehovah's Witnesses were only allowed to meet as a group on twenty-seven (27) Saturdays during 2009. (Docket No. 19, Exhibit C, *List of Meetings for Jehovah's Witnesses*).

Chaplain Hart notes that, when a volunteer is unavailable to lead Saturday meetings for the Jehovah's Witnesses, inmates were free to study their Bibles and other religious materials, such as the *Watchtower*, and to pray in their cells.[7] Chaplain Hart reports further that he has secured the services of a second volunteer (Mr. Jeff Syret) from nearby Livingston, Texas. As a result, Chaplain Hart reports that the two volunteers (Mr. Blume and Mr. Syret) now alternate Saturday services for Jehovah's Witnesses at the Huntsville Unit.

### B. The First Amendment Freedom to Exercise Religion

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. It is well established that inmates retain only those First Amendment rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the correctional institution. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Thus, regulations burdening an inmate's religious practices have traditionally been subject to a deferential standard and held valid if "reasonably

---

[7] Neither party provides details about the Jehovah's Witnesses or the central tenets of this faith. The Court notes, however, that the *Watchtower* is a semi-monthly magazine distributed by the Jehovah's Witnesses. *See* NEW ENCYCLOPEDIA BRITANNICA vol.6 at 524-25 (1994).

related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). "This approach ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' . . . and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (internal citation and quotations omitted).

To evaluate the reasonableness of a prison policy, the Supreme Court has adopted the following factors: (1) whether there is a valid, rational connection between the regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exist alternative means for prisoners to exercise the constitutional right at issue; (3) the impact of an accommodation on prison staff, inmates, and allocation of prison resources; and (4) whether any alternative exists that would fully accommodate prisoners' rights at low costs to valid penological interests. *Turner*, 482 U.S. at 89-91. A reviewing court is not required to weigh evenly, or even consider, each of these factors. *See Scott v. Mississippi Dep't of Corrections*, 961 F2d 77, 80 (5th Cir. 1992). Nevertheless, the Fifth Circuit has emphasized that the first factor, which demands a "logical connection" between the regulation and "legitimate governmental interests," is "controlling." *Scott*, 961 F.2d at 81. In that respect, "the other factors merely help a court determine if the connection is logical." *Id.* This Court considers the volunteer policy below in light of the *Turner* factors.

Chaplain Hart maintains that the volunteer policy is neutral and justified by prison security concerns, as well as staff and space limitations. (Docket No. 19, at 12). In support, Chaplain Hart provides an affidavit from Regional Director Robert Eason. (Docket No. 19, Exhibit B, *Eason Affidavit*). Director Eason emphasizes that the TDCJ volunteer policy does not prohibit any religious group from meeting and does not "place a burden on the practice of any offender's religion." Director Eason notes, however, that it can be difficult to find religious volunteers depending on the faith group and the location of the unit. Director Eason explains that religious programs are required to comply with the volunteer policy, nevertheless, to ensure adequate supervision in compliance with prevailing legal standards.

Director Eason provides three arguments in support of the general enforcement of the volunteer policy. First, Eason explains that the volunteer policy is necessary because Texas law prohibits an offender from acting in a supervisory or administrative capacity over another offender. (Docket No. 19, Exhibit B, *Eason Affidavit* at 2 (citing TEX. GOV'T CODE § 500.001)). Second, Director Eason notes that allowing offenders to supervise other offenders violates the holding in *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980), which barred the practice during the course of a prison-wide class action. *See also Ruiz v. Estelle*, 666 F.2d 854, 851 (5th Cir. 1982) (affirming the district court's determination to eliminate the practice of using inmates to supervise other inmates). Finally, Director Eason explains that adequate supervision is essential for compliance with the Prison Rape Elimination Act ("PREA"), Public Law 108-79, 117 Stat. 972 (Sept.

4, 2003). Director Eason opines that the use of inmates to supervise or coordinate religious programs would contravene the purpose of this legislation, which directs prison officials to provide more, not less, supervision to prevent "sexual abuse and other types of violence and disorder." (Docket No. 19, Exhibit B, *Eason Affidavit*, at 2 (quoting findings made by the National Prison Rape Elimination Act Commission). Thus, according to Director Eason, TDCJ favors the policy of using approved volunteers rather than inmates to supervise religious programs.

Although the Fifth Circuit has not addressed all of the proposed justifications proffered by Director Eason, it has upheld the TDCJ volunteer policy in the past. *See Baranowski v. Hart*, 486 F.3d 112, 121-22 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d at 564-65. In other cases, the Fifth Circuit has recognized that the general justification for TDCJ's volunteer policy is prison safety and security. *See Baranowski*, 486 F.3d at 121. As such, the Fifth Circuit has found that the volunteer policy is rationally related to a legitimate penological interest and sufficient, in other cases, to withstand a challenge under the First Amendment. *See id.*

Scott does not dispute that the policy is rationally related to the justifications asserted in this instance. He argues, however, that the policy is not neutrally applied because Muslim inmates are allowed to meet for group activities without a volunteer. With respect to this issue, the Supreme Court has deemed it "important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 90.

Chaplain Hart has not adequately addressed the issue raised by Scott, which pertains to whether the policy has the requisite neutral application at the Huntsville Unit. Chaplain Hart has not provided information about the relative size of the Jehovah's Witnesses membership in comparison to other faith groups within the Huntsville Unit and there is no information about the relative burden that would be imposed if Jehovah's Witnesses were excused from TDCJ's volunteer policy in a manner that is similar to inmates of the Muslim faith. Although the volunteer policy is facially neutral and supported by the legitimate penological interest in prison security, a fact question remains concerning the neutral *application* of this policy at the Huntsville Unit.

Significantly, the Fifth Circuit appears to have decided that the disparate treatment of Muslim inmates under the *Brown v. Beto* consent decree raises a fact issue about the neutrality of the policy's application to a particular prison unit's inmate population. *See Mayfield*, 529 F.3d at 608-09. In doing so, the Fifth Circuit has emphasized that "neutrality must be ensured, or its absence sufficiently explained in light of a legitimate penological interest, for summary judgment to be appropriate." *Id*. at 609 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 415-16 (1989); *Hammer v. Ashcroft*, 512 F.3d 961, 968-69 (7th Cir. 2008); and *Dingle v. Zon*, 189 F. App'x 8, 10 (2d Cir. 2006)). The record is currently insufficient to resolve this issue. Because a fact issue remains

regarding whether the volunteer policy is neutrally applied at the Huntsville Unit, summary judgment is inappropriate on Scott's First Amendment claim at this time.[8]

### C. RLUIPA

Scott also complains that enforcement of the prison volunteer policy has resulted in a violation of the Religious Land Use and Institutionalized Persons Act (the "RLUIPA"), 42 U.S.C. § 2000cc-1, which provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, the "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Mayfield*, 529 F.3d at 612.

To demonstrate a violation of the RLUIPA, the plaintiff must bear the initial burden to demonstrate that the policy or practice at issue "'substantial burden' on his religious exercise." *Adkins*, 393 F.3d at 567. "This threshold determination involves a

---

[8] In his response to the summary judgment motion, Scott attempts to allege that, by treating Muslim prisoners differently, prison officials have violated his right to equal protection under the Fourteenth Amendment. (Docket No. 22, at 1). Because Chaplain Hart has not responded to this allegation, the Court does not address whether Scott has demonstrated a valid claim under the Equal Protection Clause at this time.

two-part inquiry: (1) [i]s the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Longoria v. Dretke*, 507 F.3d 898, 903 (5th Cir. 2007) (quoting *Adkins*, 393 F.3d at 567). If an inmate shows that his religious exercise is substantially burdened, "it is then up to the government to demonstrate that the compelling interest test is satisfied." *Baranowski*, 486 F.3d at 124. Chaplain Hart does not dispute that the Saturday "religious meetings" and literature studies referenced by Scott qualify as "religious exercise" for purposes of the RLUIPA.[9] Therefore, the Court turns to the question whether the volunteer policy has placed a "substantial burden" on Scott's religious exercise.

The Fifth Circuit has held that a government action or regulation creates a "substantial burden" on a religious exercise "if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins*, 393 F.3d at 570. "[T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs." *Id.* By contrast, "a government action or regulation does not rise to the level of a substantial

---

[9]  The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* at § 2000cc-5(7). As the Fifth Circuit has observed, this broad definition stems from Congress's intent to expand the concept of religious exercise from the standard previously employed for determining "exercise of religion" under Religious Freedom Restoration Act or "RFRA." *Adkins*, 393 F.3d at 567 (noting that many courts under RFRA required the exercise to be central to the religion).

burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Id.*

Chaplain Hart argues that Scott cannot demonstrate a violation of the RLUIPA because Jehovah's Witnesses at the Huntsville Unit were allowed to meet intermittently for twenty-seven (27) Saturdays during 2009 when a lay volunteer was available. Scott insists, however, that irregular meetings of this nature are a substantial burden on his religious beliefs, which require regular group study of the Bible and other publications approved by the Jehovah's Witnesses. Scott claims, moreover, that Jehovah's Witnesses are unable to participate in services offered for other religious denominations because these involve "false" teachings. Scott maintains, therefore, that the inability to meet with other Jehovah's Witnesses for lack of an available volunteer substantially burdens his religious exercise in comparison to Muslim prisoners, who are allowed to meet on a regular basis with or without a volunteer.

In the past, the Fifth Circuit has found no substantial burden, and no violation of the RLUIPA, where the lack of religious services for a particular faith group was due to a dearth of available volunteers. *See Baranowski*, 486 F.3d at 124-25 (Jewish inmates); *Adkins*, 393 F.3d at 571 (members of the Yahweh Evangelical Assembly). The Fifth Circuit has emphasized, however, that determinations about whether a policy substantially burdens the exercise of religion requires a fact-specific, case-by-case review. *Mayfield*, 529 F.3d at 614. As noted above, there is insufficient information in

the record about the ability of Jehovah's Witnesses to meet in comparison to other faith groups at the Huntsville Unit facility. Other than pointing to the consent decree in *Brown v. Beto*, Chaplain Hart presents no other explanation for the disparate treatment of Muslim inmates and Jehovah's Witnesses who wish to meet without an approved freeworld volunteer. Under Fifth Circuit precedent, this raises a fact issue about the neutrality or uniformity of the policy's application at the Huntsville Unit constitutes a substantial burden on the exercise of religion for purposes of a RLUIPA analysis. *See Mayfield*, 529 F.3d at 614.

Assuming that a substantial burden exists, the RLUIPA requires a reviewing court to determine whether the burden is nevertheless justified by a compelling government interest that is achieved through the least intrusive means. *See Sossamon*, 560 F.3d at 334. Pointing to the affidavit from Director Eason, Chaplain Hart argues that security needs of the facility justify maintaining the volunteer policy where Jehovah's Witnesses are concerned and that state law prohibits other prisoners from acting as supervisors in any capacity. Even assuming that the policy is supported by a compelling interest in prison security, the unresolved fact issue regarding TDCJ's neutral application of the policy calls into question whether the TDCJ's application of the policy to Jehovah's Witnesses at the Huntsville Unit is narrowly tailored to the TDCJ's asserted interests, as required by the RLUIPA. *See Mayfield*, 529 F.3d at 615; *see also Newby v. Quarterman*, No. 06-11233, 2009 WL 1158854, at *5 (5th Cir. April 30, 2009) ("While Buddhists might not be entitled to the benefits of the consent decree in *Brown v. Beto*, the fact that

Muslims regularly engage in communal worship without an approved volunteer is some evidence that security and safety concerns identified by Texas can be addressed through less restrictive alternatives."). These fact issues, when viewed in the light most favorable to Scott, indicate that summary judgment is not appropriate based on this limited record. Accordingly, the defendant's motion for summary judgment on Scott's RLUIPA claim must be denied at this time.

## IV.   CONCLUSION AND ORDER

Accordingly, based on this record, the Court **ORDERS** as follows:

1. The defendant's motion for summary judgment (Docket No. 19) is **DENIED** without prejudice to reconsideration.

2. The Court will enter a separate scheduling order for purposes of a show cause hearing on the plaintiff's request for injunctive relief.

3. The Court will also reconsider the plaintiff's motion for appointment (Docket No. 14) of counsel for purposes of a hearing on the merits of his request for an injunction.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas this 3rd day of February, 2011.

Kenneth M. Hoyt
United States District Judge